1  IN THE UNITED STATES DISTRICT COURT

2  DISTRICT OF MARYLAND

3  NORTHERN DIVISION

4  IN THE UNITED STATES DISTRICT COURT

5  FOR THE DISTRICT OF MARYLAND

6  - Northern Division -

FILED ——— ENTERED
LOGGED ——— RECEIVED

SEP 2 4 2014

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY                              DEPUTY

Civil Action No.: CCB 14cv2796

Before the Hon. Judge Catherine C. Blake

8  BANCROFT COMMERCIAL, INC., .
   (d/b/a BANCROFT PRESS)

9  3209 Bancroft Road

10  Baltimore, Maryland 21215,

11              Plaintiff

12                                    **DEFENDANTS' MOTION TO DISMISS**
                                      **PLAINTIFF'S COMPLAINT**

13  v.

14  Sandra Goroff

15  42 Waterfall Drive, Suite L
    Canton, Massachusetts 02021

16  Individually

17  and
    Burton M. Peretsky

18  42 Waterfall Drive, Suite L

19  Canton, Massachusetts 02021
    Individually

20  Defendants.

21

22

23

24

25

26

27

28

## DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S COMPLAINT

This Defendants' Motion to Dismiss is based upon two Federal Rules of Civil Procedure:

- Pursuant to 12(b)(6) of the Federal Rules of Civil Procedure – failure to state a claim upon which relief can be granted – and

- Pursuant to the Federal Rules of Civil Procedure, Rule 11(b) which states:

  (b) "Representations to the Court.   By presenting to the court a pleading, written motion, or other paper—whether by signing, filing, submitting, or later advocating it—an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, formed after an inquiry reasonable under the circumstances:

    (1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

    (2) the claims, defenses, and other legal contentions are warranted by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law or for establishing new law;

    (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and

    (4) the denials of factual contentions are warranted on the evidence or, if specifically so identified, are reasonably based on belief or a lack of information.

NOW COME Defendants Sandra Goroff and Burton Peretsky, who move this Court to dismiss all counts of the Plaintiff's Complaint. In support of their motion, the Defendants incorporate the accompanying memorandum:

### I.   DEFENDANTS' MEMORANDUM

1. Plaintiff's attorney, Bruce L. Bortz, and Plaintiff BANCROFT COMMERCIAL, INC., (d/b/a BANCROFT PRESS) are for all practical purposes one and the same, as Bruce L. Bortz is listed as Publisher of Bancroft Press. (See Defendants' Exhibit 1, referenced by name as "Screen shot Bancroft showing Bortz is Publisher.")  As an attorney and as an officer of the court, Bruce L. Bortz bears a special responsibility in that he must not knowingly nor intentionally mis-state facts in any claim or action filed with the Court.  Plaintiff Attorney Bortz knows, or should know, the definition of a "frivolous" lawsuit, as defined by Nolo's Plain-English Law Dictionary thusly: "In a legal context, a lawsuit, motion, or appeal that lacks any basis and is intended to harass, delay, or embarrass the opposition."

2. Defendants Sandra Goroff and Burton Peretsky maintain that Plaintiff and Plaintiff's Attorney Bruce L. Bortz have filed a complaint before this Court that constitutes a

frivolous lawsuit, pursuant to the Federal Rules of Civil Procedure, Rule 11(b), and that, pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure – that Plaintiff fails to state a claim upon which relief can be granted.

3. Claims of Plaintiff and statements made in his Complaint are so egregious and knowingly false as to constitute this action, beyond doubt, as frivolous litigation, as defined under the Federal Rules of Civil Procedure, and that they may be subject to sanctions, as determined by the Court.

4. Plaintiff has a documented history and has exhibited a pattern of behavior of misusing the courts and of threatening lawsuits to force payments to him from others. He has used these tactics with Defendants leading up to and in filing his Complaint now before the Court. In the year 2000, The City Paper in Plaintiff's home town, Baltimore, published a long story on Plaintiff's questionable behavior. The story was headlined: "Publisher Perish? Facing Angry Authors and a Mountain of Debt, Bruce Bortz and Bancroft Press Struggle to Turn the Page." Defendants submit actual and complete text from that story as Defendants Exhibit 1, entitled, "about Bruce Bortz - From The Baltimore City Paper 11-1-2000." The story dramatically illustrates a pattern in Plaintiff's past behavior – threats of lawsuits, disrespect for court rules and procedures, and refusal to pay legitimate debts and even court judgments against him.

5. The news story copied in Defendants' Exhibit 2 recounts Plaintiff's disputes with his authors over unpaid royalties, unpaid loans from creditors, and, according to the reporter who wrote the story, "alleged breaches of writers' contracts, and implicit threats of litigation against authors who complained."

6. Another passage in the news story said: "Several Bancroft authors tell a tale being wooed by Bortz, a former newspaper editor who sold himself as a journalist working for his colleagues, a champion of the underdog. They claim they produced and promoted books only to discover that the revenues from them were being used to finance Bancroft's next release."

7. Another passage in the news story said,"A Pennsylvania public-relations company claimed Bancroft owed it $6,000."
And this...

> At the same time [in 1998], Bortz was embroiled in an e-mail volley with Melinda
> Russell [a former Bancroft Press employee], who was trying to collect nearly $6,000
> owed her for work done over the previous two years. … Russell's husband faxed
> Bortz a letter again asking for a cashier's check for the $3,487 owed his wife, lest the
> couple turn the matter over to their attorney. Bortz mailed a letter back threatening
> "legal action of my own."

8. The story also recounts Plaintiff's threats to take legal action against a corporation that
lent him $50,000:

> Amid the wrangling, the deal blew up, and in February 1999 the $50,000 loan came
> due. Bond says Bortz promised the debt would be paid, telling him [the creditor] that
> February "that Bancroft had had its best year ever [in 1998] and had just passed the
> $1 million mark in revenue." But the money never came. The following month,
> Maidstone [the creditor] sued Bancroft, seeking nearly $57,000 in principal, interest,
> and legal fees. Bortz threatened to strike back with a $1.25 million defamation suit …
> Bortz never filed the suit, but says now, "I'll still make a strong argument they
> defamed me." Maidstone won judgment against Bancroft on the loan, but has yet to
> receive a cent from Bortz. Bancroft has challenged the judgment in court. Kearney,
> the Maidstone attorney, says the Bonds have decided "not to throw good money after
> bad" and is letting the matter rest for the moment.

And these paragraphs – which Defendants Goroff and Peretsky wish to <u>especially</u> call to
the Court's attention:

> In the past two years, local attorney Melvyn Weinstock filed two suits against
> Bancroft on behalf of out-of-town firms asking for damages totaling $54,000. Once
> again, Bancroft had not paid its bills. In February 1999, the publishing firm was
> found in default of about $28,000 owed to Ruder Finn, a New York public-relations
> company. Bortz and his wife tried to have the judgment overturned two days after it
> was entered. "They claimed up and down that [Bortz] had never been served [with
> legal papers]," Weinstock recalls. "I had the process server outside the courtroom.
> When I brought him in, not only could he identify Bortz, but what was in his living
> room and what he had been wearing that Sunday morning [when he was served]."

> Bortz had also apparently signed a receipt for the process server. In an opinion
> striking down the attempt to overturn the judgment, city Circuit Court Judge William
> D. Quarles called Bortz's claim of nonservice "a virtually breathtaking falsehood."
> Judgments in the Ruder Finn case and in another brought by a Michigan equipment-
> leasing firm remain in force because the debts have yet to be repaid.

And finally this:

> While Bancroft authors seek money from Bortz, their books are in limbo due to his
> struggle with National Book Network. NBN's Lyons confirms that Bortz's contract
> with the firm was terminated in April, leaving Bancroft without a distributor,
> considered a necessity by many in the publishing business. "Bortz is either going to
> pay us or we'll sue him," Lyons says.

4

For his part, Bortz is once again going on the offensive. He accuses Lyons and NBN of "playing games with reserve funds"--the money a distributor sets aside to guarantee repayment for books returned by retailers. Bortz says the lawsuit he's planning against NBN with four other publishers will show fraud in the distributor's operations. "One of the reasons I stay in this business—which my brother, a financial guy, says is lousy--is to reform it," he says. "The balance of power in the industry has shifted too far in the favor of middlemen," such as distributors.

Lyons calls the prospective suit "absolutely absurd. This is classic Bruce Bortz. In his worldview, no matter how much you do for him, he stabs you in the back and transmogrifies himself into the victim." Lyons says his firm worked to keep Bancroft on its roster, even though the publisher owes them "tens of thousands" of dollars. "We really went to the mat to try to help him early on. We adjusted our fees downward to help him. We even gave him nearly $50,000 to print his books." Lyons maintains Bortz's legal threats are designed to get the publisher released from his debts. He adds, "I've retained a libel lawyer to deal with this."

9.  Plaintiff acted in the same manner -- as depicted in the news story -- with Defendants Goroff and Peretsky in the complaint now before the Court.  He sent three threatening emails to Defendants (see Defendants' Exhibits 3, 5 and 6), and attached to each email were pdf files of lawsuits he threatened to file against Defendants.  Each of those threatened lawsuits contained virtually the same mis-statements of fact as contained in the Complaint now before the Court.

10. Plaintiff sent a threatening email to Defendants on August 13, 2014 (see Defendants' Exhibit 3) with the Subject: "Surprise! (Or Did You Expect That Somebody Would Do This Eventually?)" and attached to it was a draft lawsuit against Defendants. Plaintiff said in the body of the email:  "If you or your attorneys would like to offer me a written settlement, I'll respond.  But if no settlement results by COB 8/25/14, I will promptly have my pro-bono attorney file suit here in Maryland federal court and I, most likely, will disseminate it to the relevant media." Defendants also submit to the Court that his statement that he would "disseminate it to the relevant media" is <u>evidence that he was threatening to engage in commercial disparagement </u>against the Defendants and their business activities and their professional reputations.

11. On August 21, Defendant Goroff responded to Plaintiff in an email and a certified letter sent to Plaintiff via US Mail (and for which Plaintiff signed). See Defendants' Exhibit 4.

12. On August 25, Plaintiff sent both Defendants another threatening email, stating, "I have revised the complaint in two important ways: I have added dictionary definitions for the

two key terms of the fraudulent misrepresentation count: "client" and "many." And, in the "damages sought" section, I have specified $14,900 as the sum initially needed to mitigate my damages." Attached was another pdf of a proposed lawsuit against Defendants. See Defendants Exhibit 5, entitled, "I have revised the complaint in two important ways."

13. On August 28, Plaintiff sent still another threatening email to Defendants, again threatening to file a lawsuit that he attached to his email as a pdf file. This email said, "I'm ready to file this electronically. But I'll hold off until 9 am tomorrow if you wish to make me a settlement offer along the lines previously suggested." (See Defendants' Exhibit 6, entitled, "Email from Plaintiff sent to Defendants Goroff and Peretsky on August 28.")

14. On September 7, 2014, in response to an email from Defendant Peretsky asking Plaintiff to withdraw his Complaint, Plaintiff responded via email with this: "You will be served this week. (As I've said before, you're in way over your head.) I'll accept a payment of settlement spread out over a year." (See Defendants Exhibit 7, entitled, "email from Plaintiff Sept 7 You Will be Served and email from Defendant Burt Sept 6.")

II.   STANDARD

15. In deciding a motion to dismiss brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, a Court will accept all well-pleaded facts as true and will draw all reasonable inferences in favor of the Plaintiff. See Hernandez v. City of Goshen, 324 F.3d 535, 537 (7th Cir.2(03). However, a Court must dismiss any claim where it appears beyond all doubt that the Plaintiff can prove no set of facts that would entitle him to relief. See id. Moreover, a plaintiff must allege in its complaint sufficient facts to set forth the essential elements of a cause of action to survive a motion to dismiss. See Lucien v. Preiner, 967 F.2d 1166, 1168 (7th Cir. 1992).

In deciding a motion to dismiss brought pursuant to Rule 11(b), the Court will, according to Rule 11(b) itself, consider accepting pleadings, written motions, or other papers— whether by signing, filing, submitting, or later advocating it— if an attorney or unrepresented party certifies that to the best of the person's knowledge, information, and belief, they are formed after an inquiry reasonable under the circumstances, that the

pleading, written motion, or other paper is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; that the claims and other legal contentions are warranted by existing law or by a nonfrivolous argument; and that the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery.

III.  <u>Motion to Dismiss Count I, Breach of Contract</u>

Pursuant to 12(b)(6) of the Federal Rules of Civil Procedure – for failure to state claims upon which relief can be granted – and

Pursuant to the Federal Rules of Civil Procedure, Rule 11(b) for

    i.    False representations made to the Court

    ii.    False representations made to harass and needlessly increase the cost of litigation

    iii.    Claims and legal contentions that are frivolous, and

    iv.    Claims and contentions that lack evidentiary support.

16. Plaintiff claims breach of contract under two simple one-page letters of agreement, the first, a Letter of Agreement concerning the Plaintiff's book **My Father's Day Gift**, entered as Plaintiff's Exhibit 6 and incorporated by reference into his Complaint, and the second, a Letter of Agreement concerning the Plaintiff's book **Aftershock**, entered as Plaintiff's Exhibit 15 and incorporated into his Complaint.   Neither that November 22, 2013 one-page **My Father's Day Gift** letter of agreement that Plaintiff and Defendant Goroff signed nor the March 5, 2014 one-page **Aftershock** letter of agreement that Defendant Goroff and Plaintiff both signed, make any mention of Defendant Peretsky, nor is Defendant Peretsky a party to either of these contracts, nor to any contract or agreement made with Plaintiff. Therefore, any claims made about Defendant Peretsky with regard to Plaintiff's COUNT ONE, Breach of Contract, must be considered baseless, as Defendant Peretsky has never had a contractual relationship with Plaintiff and, pursuant to Rule 12(b)(6), Plaintiff's Complaint does not state a claim against Defendant Peretsky upon which relief can be granted.

17. As an attorney-at-law, and given the simplicity of the letters of agreement that he signed with Defendant Goroff, Plaintiff must have known then, and he certainly must have known when he filed his Complaint before the Court, that he and Defendant Peretsky did not at any time have a

contractual agreement with one another. Thus, his statement is, Pursuant to Rule 11(b), knowingly and intentionally false in paragraph 46 of his complaint, to wit "By entering into the Publishing (sic) Agreement, Defendants Goroff <u>and Peretsky</u> promised to put forward their "best efforts" to procure publicity for Plaintiff's 'My Father's Day Gift,' as <u>Defendant Peretsky was not a party to that agreement nor to any agreement or contract with Plaintiff</u>.

18. Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure – failure to state a claim upon which relief can be granted … That November 22, 2013 one-page letter of agreement that Plaintiff and Defendant Goroff both signed with regard to Plaintiff's book, **My Father's Day Gift** promises only to Plaintiff that Defendant Goroff, referenced in the letter as "Sandra Goroff & Associates (SG)," will "use its best efforts to secure appropriate, print, broadcast, online and social media to promote Dave Andrews and his book, **My Father's Day Gift**." No promises are made by Defendant Goroff in that one-page letter of agreement that Plaintiff signed as to <u>any</u> publicity placements that would be generated by Sandra Goroff nor any book sales that would result from Defendant Goroff's work. By any measurable standard, Defendants Goroff and Peretsky expended their "best efforts" in their work on **My Father's Day Gift** and maintained throughout their efforts close contact with Plaintiff and **My Father's Day Gift** author David Andrews. See Defendants' Exhibit 4, entitled "Sandy response to Bruce lawsuit threat 8-21-2014 with Appendices;" Defendants' Exhibit 8, entitled "My Father's Day Gift <u>Partial</u> List of Media Outlets Contacted," listing 46 separate contacts (most of these media outlets were contacted by email, as that is the standard of contact today, as well as by phone in follow-up calls to them, as were other media outlets and contacts not listed that were contacted through their respective Websites); and Defendants' Exhibit 9, entitled, "emails to from Bruce re **My Father's Day Gift**," which lists 174 emails, nearly all of which were sent to or copied to Plaintiff during the course of the publicity campaign.

19. The latter exhibit, the listing of those 174 emails, nearly all of which the Plaintiff was sent or copied on, constitutes considerable evidence that it was egregiously and knowingly false, pursuant to Rule 11(b), for Plaintiff to state in his complaint before the Court in his paragraph 52 that "Defendants sent Plaintiff the occasional email, but with very few exceptions, most had to do with payments of their fees."

20. Pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure – failure to state a claim upon which relief can be granted … The March 5, 2014 simple one-page Aftershock letter of agreement (Plaintiff's Exhibit 15) that Defendant Goroff and Plaintiff both signed again references Defendant Goroff as "Sandra Goroff & Associates (SG)." Before preparing the letter of agreement, Defendant Goroff went to Plaintiff's Website to read about the book Aftershock. On Plaintiff's Website, the Aftershock Web page, http://bancroftpress.com/aftershock-2/, submitted as a "screen shot" to the Court as Defendants' Exhibit 10, prominently displays the name J. L. Herchenroeder in the heading of the book's description, at the top of the page just beneath the book title. Barely noticeable on the page and mentioned only in passing is the name of the actual author of the book, Joe Lane. Defendant Goroff, surmising that the "J.L." initials in J.L. Herchenroeder's name stood for Joe Lane, drafted this paragraph and placed it prominently into the Letter of Agreement that she submitted to Plaintiff on March 5, 2014 and that Plaintiff subsequently signed without any requested changes (See Plaintiff Exhibit 15): "SG will use its best efforts to secure appropriate print, broadcast, online, and social media to promote author JL Herchenroeder [emphasis added] and his book Aftershock. SG will develop story angles, write press materials, create an individualized media list for the project and attempt to schedule interviews, mentions and items about both the book and author. SG will work cooperatively with Bancroft Press and JL Herchenroeder [emphasis added] and provide regular updates." As Plaintiff's own Exhibit 15 clearly shows, Plaintiff subsequently signed the Letter of Agreement without any changes. Pursuant to 12(b)(6) of the Federal Rules of Civil Procedure – failure to state a claim upon which relief can be granted – Defendants maintain that the flawed Letter of Agreement referencing a book by J.L. Herchenroeder, is null and void and cannot be relied upon as evidence of a claim of breach of contract, upon which relief can be granted.

21. Pursuant to Rule 11(b), as Plaintiff is an attorney and a book publisher who says in the his complaint against Defendants that he has worked with many publicists before this date, and we can assume had contracts with those publicists, Plaintiff must have known then and must have known when he filed his Complaint before this Court that the Aftershock letter of agreement that he signed had important information on it that was in error. And knowing that, and submitting the flawed letter of agreement to this Court as an official Exhibit to support his case, Pursuant to Rule 11(b), the Plaintiff has once again shown his intentional disregard for the truth and has provided instead additional evidence for the Court to grant

Defendants' Motion to Dismiss.

22. Pursuant to Rule 12(b)(6), even if one is to assume that the agreement on **Aftershock**, referenced in the previous paragraph, is valid, Defendant Goroff promised only her "best efforts" to secure publicity for the book, to "work cooperatively" with the publisher and author, and to "provide regular updates." No promises are made by Defendant Goroff in that one-page letter of agreement that Plaintiff signed as to any publicity placements that would be generated by Sandra Goroff nor any book sales that would result from Defendant Goroff's work. Defendants' Exhibit 4, entitled "Sandy response to Bruce lawsuit threat 8-21-2014 with Appendices;" Defendants' Exhibit 11, identified as "Partial List of Media Outlets Contacted by Sandra Goroff and or Burt Peretsky During Publicity Efforts for Aftershock;" and Defendants' Exhibit 12, identified as "emails to from Bruce re Aftershock," dramatically illustrates that Defendants Goroff and Peretsky exercised their best efforts on the **Aftershock** project and provided Plaintiff with "regular updates" on the progress of their work.

23. Pursuant to Rule 11(b), it is also clear that – upon inspection of Defendants' Exhibits 4, 11, and 12, which all contain information that Plaintiff had and knew when he filed his Complaint – that Plaintiff has made false statements with regard to breach of contract allegations in the **Aftershock** book project.

IV.     Motion to Dismiss Count II, Fraudulent Misrepresentation

Pursuant to the Federal Rules of Civil Procedure, Rule 11(b) for

     i.     False representations made to the Court

     ii.     False representations made to harass and needlessly increase the cost of litigation

     iii.     Claims and legal contentions that are frivolous, and

     iv.     Claims and contentions that lack evidentiary support.

Defendants Goroff and Peretsky also Move to Dismiss Plaintiff's complaint pursuant to the Federal Rules of Civil Procedure, Rule 11(b), in that Plaintiff's statements and claims made in his complaint are so egregious and knowingly false as to constitute this action, beyond doubt, as frivolous litigation. He also makes claims that he cannot possibly prove. The following is submitted to the Court pursuant to Rule 11(b):

24. Plaintiff claims in his Complaint that:

> "On her website, Goroff represented the following: "Clients of Sandra Goroff &
> Associates include" *[Note the use of the present tense]* among others, "Clive
> Cussler, Tracy Kidder, Garrison Keillor, Chris Van Allsburg, Maurice Sendak,
> Peter Guralnick, Marian Wright Edelman, Dr. Jane Goodall, Former President
> Jimmy Carter, Former First Lady Rosalynn Carter, Judy Collins, Gerry Spence,
> Alvin Toffler, Mark Helping, Roger Tory Peterson, John Kenneth Galbraith, and
> Lois Lowry" and 28 others. A true copy of that website listing is attached as
> Exhibit 1 and incorporated by reference herein. ... "Subsequent research by the
> Plaintiff has determined that not one of these big-name authors were then [when
> Plaintiff was considering contracting with Defendant Goroff] current clients of
> Goroff."

In fact, Plaintiff's Exhibit 1 <u>does not show any such language</u> on Defendant Goroff's

Website. At no time and in no place on her Website, www.sandragoroff.com, has

Defendant Goroff claimed or does claim that "Clients of Sandra Goroff & Associates

<u>include</u>" any authors, and it is egregiously dishonest for Plaintiff to invent such a claim

and rely upon such a claim to allege fraud in the inducement/fraudulent

misrepresentation. Plaintiff knew when he filed his complaint before the Court, or he

should have known, that Defendant Goroff was not mis-representing herself in this

instance as having these authors as "current" clients, a claim she simply never made, nor

could have made, as several of the authors listed were dead.

25. The following authors that she lists on her Website and whom she had represented along

with their books <u>had already died years before Plaintiff said he first looked at that list</u>. It

would have been illogical for Defendant Goroff to claim that she was still representing

dead people, and of course, she never made that claim on her Website, anywhere else, or

orally. Plaintiff knew or should have known when he filed his Complaint now before the

Court that:

- Famed children's book author Maurice Sendak, -- whom Plaintiff mentions in his
  Complaint as one of the authors Defendant Goroff was claiming to represent in the

present tense -- had died on May 8, 2012. Plaintiff's home-town newspaper, the Baltimore Sun, had several stories on Mr. Sendak's passing, including one published on the same day as his death: http://articles.baltimoresun.com/2012-05-08/features/bal-maurice-sendak-dead-at-83-20120508_1_maurice-sendak-world-of-toothy-monsters-night-kitchen, a true copy of the Baltimore Sun story submitted as Defense Exhibit 13, and entitled, "Baltimore Sun story on death of Maurice Sendak." In 2014 alone, in the days before Plaintiff filed his complaint before the Court, the Baltimore Sun printed eight stories that mentioned the late Mr. Sendak and the fact that he was dead.

- Ralph Kovel, an American author of 97 books and guides to antiques, co-authored with his wife, Terry Kovel, died on August 28, 2008. The New York Times had a major story on Mr. Kovel's death in its Business Section on September 6, 2008.

- Former US Solicitor General Archibald Cox died on May 29, 2004, and his passing was widely reported in major media throughout the United States, as well as in the pages of Plaintiff's home-town newspaper the Baltimore Sun, which carried the story on Mr. Cox's passing on May 31, 2004.

- Famed ornithologist Roger Tory Peterson -- whom Plaintiff mentions in his Complaint as one of the authors Defendant Goroff was claiming to represent in the present tense -- passed away on July 28, 1996, and the Plaintiff's home-town newspaper, the Baltimore Sun, printed a long tribute to Mr. Peterson on August 03, 1996.

- John Kenneth Galbraith -- whom Plaintiff mentions in his Complaint as one of the authors Defendant Goroff was claiming to represent in the present tense -- the iconoclastic economist, teacher and diplomat and an unapologetically liberal member of the political and academic establishment, died on April 29, 2006, at a hospital in Cambridge, Mass., of natural causes. A major story on his passing was written for The New York Times News Service, and that story was carried in the Plaintiff's home-town newspaper, the Baltimore Sun, on April 30, 2006.

26. Plaintiff's Complaint before the Court, in paragraphs 4-18, repeatedly makes the contention that Defendant Goroff claimed that the many authors mentioned on her

Website were then "current" clients of hers. Does the Plaintiff expect the Court to believe, and can he possibly prove, that Defendant Goroff fraudulently claimed that she was, in the present tense, representing dead people for publicity? The answer to this question is simply that the Plaintiff has knowingly submitted to the Court a claim that is false and cannot be proven, an act that further categorizes his complaint as frivolous litigation, and an act that Defendants say gives the Court another reason to grant Defendants this Motion to Dismiss, pursuant to Rule 11(b).

27. In Plaintiff's Complaint before the Court, in paragraphs 18 and 19, Plaintiff claims,

> In truth, Goroff, in the years 2009 through the present, has been almost exclusively working on her own book, a photography book called Solitary Soul, to get it published and then to promote it. By the year 2011, the book was already in the catalogue of its eventual publisher, Lorimer Press, and she was already promoting it via such social media as Daily Basics. The book would not come out until November 2013.

> During the months of April through August of 2014, Defendant Goroff placed 12 different items on Facebook promoting that book, contrary to her earlier insistence that her book wouldn't conflict with Plaintiffs because her publicity efforts would cease as of the time of publication. To further publicize her book, she was constantly using Twitter and Pinterest, and served as a contributing editor on The Daily Basics blog site.

Pursuant to Rule 11(b) and Rule 12(b)(6), Plaintiff knew or should have known when he filed the Complaint before the Court that his statements in paragraphs 18 and 19 were untrue or irrelevant to both a breach of contract claim and to a fraudulent misrepresentation claim and were not claims upon which relief could be granted. As Defendant Goroff explained to Plaintiff in an August 21 email and certified letter sent to Plaintiff several weeks before he filed the Complaint now before the Court (she was responding to a then-threatened lawsuit similar to the one now before the Court – see Defendants' Exhibit 4):

> You referenced my own book of photography, Solitary Soul, and you commented on my client list in 2009 and over the time leading up to when we discussed your giving me the contract to publicize My Father's Day Gift. Please be aware that:

> o By 2009, virtually all the photos featured in my book had been taken; Lorimer Press first contacted me in the summer of 2011 about publishing them; and I later worked to publicize my own book. But, my other work (and my other interests) continued completely unaffected by my work on my book.

- As for the Daily Basics, I am a regular contributor to that Website, writing an occasional column on photography, and I am described by the Daily Basics, itself, in connection with my published photography book. The Daily Basics also describes me as "a literary and art publicist."
- I actually didn't sign a contract for Lorimer Press to publish my book Solitary Soul until late December 2012. I doubt that it was in the publisher's catalogue of 2011, and more likely was in the catalogue beginning in the Spring of 2013.
- When you first contacted me in late December 2013 to do the publicity for My Father's Day Gift, Solitary Soul had been already published, and my publicity work had been virtually completed. As you know, publicity efforts begin up to six months or more before publication dates.

Placing 12 items on my personal Facebook site about my photography book in a six-month period, a point of contention you made, is hardly excessive, but "using Twitter and Pinterest," as well as Facebook, does show that I am adept at using social media.

28. In paragraph 20 of his complaint, Plaintiff says, "Also during this time [during the period before he was considering contracting with Defendant Goroff], in an interview with Caroline Leavitt, Defendant Goroff said: "I'm obsessed with photography. I literally think about it all day." Pursuant to Rule 11(b), Plaintiff certainly knew when he filed his Complaint now before the Court, or he should have known, that this statement is an obvious exaggeration. Plaintiff knew it was an obvious exaggeration, because in his own Complaint, he cites book publicity work that Defendant Goroff conducted during the same period of time, work that denies the "literal" meaning of her exaggeration, and in her August 21, 2014 email and certified letter to Plaintiff, Defendant Goroff wrote the following (see Defendants' Exhibit 4):

There was a brief period when my mother in Florida was ill and before and after she passed away in late 2012 when I ceased soliciting clients, but before, and especially afterward, leading up to the time of contact with you, I was quite busy with book publicity clients, among them Brandeis University Professor and Sociology Department Chair David Cunningham for his book on the KKK, **Klansville USA**, on which Burt assisted, and Boston attorney James Conroy's book on Abraham Lincoln's involvement in the Hampton Roads Peace Conference of 1865, just to name a couple that received significant national publicity as a result of our work.

29. And, in response to Plaintiff's claim in Paragraph 21 of his Complaint, in which he

said, "On December 12, 2013, Defendant Goroff reached an agreement with an art gallery to sell her photographs, Defendant Goroff wrote to Plaintiff (see Defendants' Exhibit 4):

> The art gallery in question that you mentioned, the Walker-Cunningham Gallery, then of Newbury Street in Boston, was a publicity client of mine before it represented my photography. I had promoted the gallery and various artists it represented in the 2011-2012 period, including the artist Dora Atwater Milliken.

And:

> As for your comment that my book publicity work was "drying up" in 2009, it was in that year that I was hugely successful in publicizing the September publication of the book **Life in the Balance** by well-known cardiologist Dr. Tom Grayboys, garnering publicity for him in the form of a feature in *The New York Times*, an appearance on ABC's Good Morning America, the Leonard Lopate Show at WNYC Radio in New York City. Also, I landed publicity for **Life in the Balance** in Parade.com, the *LA Times*, Voice of America, *Harvard Magazine*, and the *New England Journal of Medicine*, among others.

And:

> In 2011-2013, leading up to the late 2013 contact you made with me about **My Father's Day Gift**, I had several other book/author publicity clients, including the above-mentioned books on the KKK and on Abraham Lincoln's involvement in the 1865 Hampton Roads Peace Conference.

Thus, pursuant to Rule 11(b), when Plaintiff talked in paragraph 21 of his Complaint about Defendant Goroff's photography agreement with a gallery, he knew he was making a false statement.

30. In Paragraph 24 of his Complaint, Plaintiff writes: "Goroff, on her website, claimed (and claims): 'These professional relationships [with countless reporters, journalists, and producers] provide us unparalleled access to local and national media and continue to produce exceptional results.' In fact, almost all of her contacts had dried up during a lengthy period during which Goroff had no book publicity clients, or almost none, and certainly none for which she would be engaged with the higher echelons of the media world." Pursuant to Rule 11(b), this is another knowingly false statement made by Plaintiff and merits Dismissal of his complaint. In the

15

aforementioned email to Plaintiff of August 21, 2014 (see Defendants' Exhibit 4), Defendant Goroff cited work she had done on two books that received extensive publicity thanks to Defendant Goroff's work in the "higher echelons of the media world." She cited in that letter Brandeis University Professor and Sociology Department Chair David Cunningham's book on the KKK, **Klansville USA**, and Boston attorney James Conroy's book on Abraham Lincoln's involvement in the Hampton Roads Peace Conference of 1865. Thanks to Defendant Goroff's publicity efforts, her engagement with "the higher echelons of the media world," and her skills and knowledge in book publicity, **Klansville USA** and its author were featured on NPR's "Fresh Air" program, in the Washington Post, in favorable reviews in Kirkus Reviews and in Publishers Weekly, on WGBH-TV (PBS) in Boston, on WCVB-TV in Boston, on politicalresearch.org, on Oregon Public Broadcasting, on New England Cable News (TV), in the Burlington (NC) Times News, and in several other outlets. Also, thanks to Defendant Goroff's efforts and personal contacts, the award-winning PBS television program *The American Experience* has committed to producing a documentary based in whole, or in part, on **Klansville USA**. Thanks to Defendant Goroff's publicity efforts and her contacts with key media figures, Conroy and his book were featured on NPR's "Here and Now" radio program, on CSPAN television, on WBZ/Boston and WCCO/Minneapolis, on the Pat Williams Show in Orlando, and on CNN, among several other media outlets. It was also reviewed favorably on several key media outlets. Plaintiff could have easily researched each of these books and the media outlets in which they were featured prior to his filing his Complaint with this Court, but he merely dismissed the books as "minor books" so that he could satisfy his fictional account of supposed fraudulent misrepresentation by Defendant Goroff.

31. Other knowingly false statements (not addressed above) made by the Plaintiff in the Complaint before the Court:

   a. In paragraph 3 of Plaintiff's Complaint, he claims that "a true copy" of Defendant Goroff's letter "is attached as Exhibit 3." However, as Plaintiff certainly knows, Plaintiff's Exhibit 3 is not a "true copy" of the letter, as it omits all four appendices to that letter, Appendix A, B, C, and D, all of which are extensive and

show conclusively how Defendants applied their "best efforts" on publicity projects for both of Plaintiff's books. An actual true copy of subject letter is in Defendants' Exhibit 4.

b. In paragraph 25 of Plaintiff's Complaint, he claims, "In late 2009, subsequent research has discovered, Goroff worked the last of her book publicity jobs, a September 2009 release of a book, "Life in the Balance" by Dr. Tom Graboys." Plaintiff knew when he filed the complaint, because he must have read his own Exhibit 3, the letter Defendant Goroff wrote to him on August 21, 2014, that she had, since 2009, handled publicity work for several other books. Plaintiff himself belies his own "last of her book publicity jobs" statement with these (also knowingly false and/or knowingly incomplete and misleading) statements he makes further into his Complaint: (in paragraph 31 of his Complaint) "In all of 20 12, it turns out, Goroff handled publicity for one very minor book, *The Rising at Roxbury Crossing*," and (in paragraph 32 of Plaintiff's Complaint) "In all of 2013, it turns out, Defendant Goroff handled publicity for only one book, James B. Controy's (sic) *Our One Common Country*."

c. In paragraph 35 of Plaintiff's Complaint, he wrote, "Upon subsequent and careful examination, it turns out that, except for Goroff's own book, almost all her professional activity from 2009 to the present revolve around things having nothing to do with book publicity." This statement is knowingly false by virtue of what Plaintiff says in other sections of his Complaint and by virtue of what Defendant Goroff wrote to him on August 21, 2014 (Defendants Exhibit 4).

d. In paragraph 39 of Plaintiff's Complaint, he wrote: As for Defendant Peretsky, his Massachusetts corporation, Peretsky Strategic Communications, was dissolved by the state of Massachusetts on May 31, 2007, though a website bearing that name was still up as of August 2014." This statement is completely irrelevant to the causes of action cited in Plaintiff's complaint, and it is knowingly false as

Defendant Peretsky's Website, www.peretsky.com (Defendants' Exhibit 14, "Peretsky's Website") bears the name "Peretsky <u>Strategy</u> Communications," and no representation nor mention at all is made on that Website of a <u>corporation</u> bearing that or any other similar name.

e. In paragraph 40 of Plaintiff's Complaint, he wrote: "Notwithstanding Goroff's assertions otherwise, Peretsky's website, it turns out, bears no mention of any publicity work on any books, or even that it was an available service." This is a knowingly false statement as well, as shown in Defendants' Exhibit 14, and quoted as follows under the heading of Affiliations, a listing of one of two groups with which Defendant Peretsky works:

> "Sandra Goroff & Associates provides expert public relations counsel and publicity services for authors, experts, business leaders, artists, and other creative individuals. Company principal Sandra Goroff focuses on long term professional relationships that produce results. Chosen as one of the top hundred marketers in the U.S. by *Advertising Age Magazine* and profiled in the *Wall Street Journal*, Goroff is a highly regarded, award winning veteran publicist. After a 30-year career including 11 years in-house at Houghton Mifflin Company, Goroff delivers with exceptional access to influential producers and journalists. Clients and best-selling authors gain exposure through important print, broadcast and online venues, including the *THE NEW YORK TIMES*, NATIONAL PUBLIC RADIO, *O MAGAZINE*, MARTHA STEWART, CBS SUNDAY MORNING, THE TODAY SHOW, GOOD MORNING AMERICA, OPRAH, FRESH AIR, *FAST COMPANY* and *BUSINESSWEEK*.

f. In paragraphs 44 through 64 of Plaintiff's Complaint, he falsely describes, despite knowing the truth, Defendants' work on the **My Father's Day Gift** book publicity project. Before he filed his complaint, he knew the truth as to what Defendants did on the project, i.e., expending their "best efforts" on it, because he had received extensive reports from Defendants (see Defendants' Exhibit 8, entitled "My Father's Day Gift <u>Partial</u> List of Media Outlets Contacted," listing 46 separate media outlet contacts), and had been sent or copied on 174 emails during the course of the publicity campaign ( see Defendants' Exhibit 9, entitled, "emails to from Bruce re **My Father's Day Gift**").

g.  In paragraphs 65 through 69 of Plaintiff's Complaint, he falsely describes, despite knowing the truth, Defendants' work on the **Aftershock** book publicity project. Before he filed his complaint, he knew the truth as to what Defendants did on the project, i.e., expending their "best efforts" on it, because he had received extensive reports from Defendants (see Defendants' Exhibit 11, entitled "Partial List of Media Outlets Contacted by Sandra Goroff and or Burt Peretsky During Publicity Efforts for Aftershock," and Defendants' Exhibit 12, entitled "emails to from Bruce re Aftershock," which lists 137 emails that had been sent or copied to Plaintiff by Defendants during the **Aftershock** book publicity project.

h.  In paragraphs 73 and 74, Plaintiff asks in his Complaint for damages in the **My Father's Day Gift** project equal to the value of books according to the number of books he says Defendant Goroff "hoped" he would sell, 10,000 books and the number he allegedly sold, 1100 books. In paragraph 74, he likens Defendant Goroff's quoted "hope" to what he said "Defendant Goroff predicted" would be sold. Not only is his statement equating a hope and a prediction knowingly false, but Plaintiff also knew then that he only published 5000, <u>NOT</u> 10,000 **My Father's Day Gift** books, and thus his demand for damages is knowingly false as well (see Defendants Exhibit 15, entitled, "5000 copies Email from Bruce to Sandy 6-13").

i.  In paragraph 48 of Plaintiff's complaint, he wrote: "This $9,000 "premium" sum [for the **My Father's Day Gift** contract] was $5,400 more than Plaintiff usually spent to publicize a book." Defendants believe this to be a knowingly false statement as well, as the aforementioned published report (see Defendants Exhibit 2) relates that a Maryland state court judgment against Plaintiff had been entered for $28,000 that he owed at one time (and may still owe) to a publicity firm, Ruder and Finn.

j.  In paragraph 53 of Plaintiff's complaint, he wrote: "Defendants initiated no phone calls to Plaintiff to report on the progress of their efforts [during the **My Father's Day Gift** publicity project]. In fact, Defendants Goroff and Peretsky made many calls to Plaintiff during that period and reference many of them in Defendants' Exhibit 9.

k.  In paragraph 59 of Plaintiff's Complaint, he claims, "Despite all the time they had [on

the **My Father's Day Gift** publicity project], Defendants failed to test/hone their pitch to something that worked. Plaintiff knew when he made that statement in the Complaint now before the Court that Defendants went far beyond what Plaintiff had specified in his marketing plan for the book and its author. Defendants attempted to secure media placements for the author (an expert on the subjects of male role models and mentoring) in January, National Mentoring Month, and in February, when President Obama announced a White House effort to gain mentors for boys of color, an effort called "My Brother's Keeper." Defendants even arranged a live January radio interview with the author, an interview simulcast on two 50,000-watt stations, WBZ in Boston and WCCO in Minneapolis, an interview that would have been heard by millions of people in 38 states and parts of Canada and online for the whole world to hear, but because the author's telephone ringer had been turned off at the appointed hour, the interview never took place in January. Furthermore, Defendants crafted three news releases on the book and several fact sheets and pitch letters on the book and its author, using angles that ranged from the standard information upon its release, to the author's expertise on mentoring, and to the book being "the perfect Father's Day gift." Plaintiff knew all of the foregoing, and for him to say that Defendants "failed to hone/test their pitch" is a knowingly false statement, pursuant to Rule 11(b)

l. In paragraph 60 of Plaintiff's complaint, he makes another knowingly false assertion: "Contrary to repeated assurances, Defendants' personal media contacts were (and are) few and far between because they hadn't extensively worked book PR for a number of years before this project-and even those folks felt free to ignore them, because their client list was sparse or non-existent." Again, pursuant to Rule 11(b), this is a knowingly false statement that the Plaintiff made. His own set of claims in his Complaint belie this statement, and as just one example of Defendants' personal media contacts claims, Defendant Goroff called her friend, CBS (TV) Saturday Morning host and CBS News Senior Correspondent Anthony Mason to pitch coverage of **My Father's Day Gift** and its author during National Mentoring Month, January. Defendant Goroff called Mason on his cell-phone and had a 20-minute conversation with him <u>while he was at home, shaving!!!</u> Plaintiff was told that story

long before he filed his Complaint now before the Court.

m. In paragraph 61 of his Complaint, Plaintiff maintains, "At no time [during the **My Father's Day Gift** project] did Defendants adjust, downward, their target media list." In fact, Plaintiff encouraged Defendants to target their media list downward, and Defendants responded, pitching the book and author to the local Baltimore media, where the author lives and works. Defendant Peretsky actually contacted his friends, Hearst Television Stations News Director Candy Altman and former WBAL-TV President and General Manager Bill Fine and asked them to intercede on behalf of the pitch with the Hearst Baltimore station, WBAL-TV. Ms. Altman liked the story idea and sent it off to WBAL-TV's news director, but in the end, the station itself did not bite.

n. In paragraph 62 of his Complaint, Plaintiff states this false accusation: "Defendants reported just once [during the **My Father's Day Gift** project] on who (sic) they had pitched but never indicated any response-all Plaintiff could assume was that everyone ignored them, and didn't even have the courtesy of saying they'd passed or delayed a decision." Pursuant to Rule 11(b), Plaintiff knew when he filed the Complaint now before the Court that this was false. As Defendants' Exhibit 9 clearly shows, Defendants were meticulous in keeping Plaintiff in the loop, sending him or copying him on 174 emails during the course of the publicity project.

o. Apparently to obfuscate issues, Plaintiff also made many statements in his Complaint that were knowingly irrelevant to his claims of fraudulent misrepresentation and breach of contract, and these claims, among them, serve only to waste the Court's time, Defendants maintain:

- In paragraph 26 of Plaintiff's Complaint, he wrote, "Goroff, among other things, used her own website to promote her availability to 'secure syndicated columns and developing and pitching new program concepts." Even if true, Defendants submit to the Court that this statement is irrelevant and does not support either causes of action in Plaintiff's complaint.

- In paragraph 27 of Plaintiff's Complaint, he wrote, "As subsequent research reveals, Goroff allowed her Massachusetts corporation to become defunct after

failing to file the necessary reports in 2009, 2010, 2011, 2012, 2013, and 2014. The Secretary of the Commonwealth of Massachusetts officially dissolved Goroff's corporation on June 30, 2014." Even if true, Defendants submit to the Court that this statement is also irrelevant and does not support either counts in Plaintiff's complaint.

- In paragraph 28 of Plaintiff's Complaint, he wrote, "In 2011 (June 1), Goroff advertised herself on the blog Mediabistro as, among other things, a "voice actor," and at about the same time described herself in a tweet as "an aspiring voice actor." Even if true, Defendants submit to the Court that this statement is also irrelevant and does not support either causes of action in Plaintiff's complaint.

- In paragraph 33 of Plaintiff's Complaint, he wrote, "At one time, Defendant Goroff taught a graduate level course at Emerson College in book publicity and marketing. There is no record of her having done so during the years 2009 onward." Even if true, Defendants submit to the Court that this statement is also irrelevant and does not support either causes of action in Plaintiff's complaint. It does, however, speak to the positive credentials of Defendant Goroff.

- In paragraph 34 of Plaintiff's Complaint, he wrote, "At one time, Defendant Goroff gave talks to prominent groups about publicizing books. There is no record of her having done so during the years 2009 onward." Even if true, Defendants submit to the Court that this statement is also irrelevant and does not support either causes of action in Plaintiff's complaint. It does, however, also speak to the positive credentials of Defendant Goroff.

V.    CONCLUSION

As dramatically proven by the foregoing, the Plaintiff's Complaint fails to state a single claim upon which relief can be granted, pursuant to Rule 12(b)(6). And, pursuant to Rule 11(b), his claims that defendants misrepresented their recent history, both orally and on their website, and that they breached two contracts with Plaintiff – are patently false, and each of those claims is individually patently false. His complaint is so egregious as to be deserving of Court sanctions, but Defendants, acting pro se, recognize that this Motion cannot and does not ask for sanctions.

Defendants only ask that for the foregoing reasons stated in this Motion and for those in the

accompanying memorandum, that the Court dismiss Plaintiff's complaint in its entirety.

Respectfully Submitted,

**We declare under penalty of perjury that the foregoing is true and correct.** Signed this
22nd day of September, 2014.

Sandra L. Goroff, 42 Waterfall Dr., Apt. L, Canton, MA
02021. 617-750-0555 sgma@aol.com and

Burton Peretsky, 42 Waterfall Dr., Apt. L, Canton, MA
02021. 781-828-4714 peretsky@verizon.net

**Defendants, Pro Se**

CERTIFICATE OF SERVICE

This is to certify that a copy of the foregoing MOTION TO DISMISS has been sent both by Certified Mail postage prepaid, signed return receipt requested, and First Class Mail, postage prepaid, this 22nd day of September 2014, to counsel for Plaintiff, to wit:

To:  Mr. Bruce L. Bortz, Esq.
     3209 Bancroft Road
     Baltimore, Maryland 21215

Sandra Goroff

42 Waterfall Drive, Suite L
Canton, Massachusetts 02021
617-750-0555, <sgma@aol.com>

Individually

and

Burton M Peretsky

42 Waterfall Drive, Suite L
Canton, Massachusetts 02021
781-828-4714, <peretsky@verizon.net>

Individually

Defendants, Pro Se

dated: September 22, 2014
       Canton, Massachusetts