**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| BANCROFT COMMERCIAL, INC. *doing business as* Bancroft Press | : <br> : <br> : |
| v. | :    Civil No. CCB-14-2796 <br> : <br> : |
| SANDRA GOROFF, *et al.* | : <br> : |

**MEMORANDUM**

     Bancroft Commercial, Inc. ("Bancroft"), doing business as Bancroft Press, brings this suit against Sandra Goroff and Burton Peretsky (collectively, "the defendants"). Bancroft alleges that the defendants committed fraud by misrepresenting their qualifications as book publicists. Bancroft also alleges that the defendants breached two book publicity contracts. Before the court is the defendants' motion to dismiss, which Bancroft belatedly opposed with a three-sentence opposition, and Bancroft's motion to compel answers to interrogatories. The court finds oral argument unnecessary to resolve the issues. *See* Local R. 105.6 (D. Md. 2014). For the reasons stated below, the court will grant the motion to dismiss and deny as moot the motion to compel.

**BACKGROUND**

     Bancroft is a Baltimore-based book publisher headed by Bruce Bortz, who is also acting as Bancroft's attorney in this action.[1] (Compl. ¶ 2, ECF No. 1.) In 1996, Ms. Goroff, a publicist, performed publicity services for two of Bancroft's books. (*Id.* ¶ 4.) Mr. Bortz was pleased with her work, but considered her fees too high for future projects. (*Id.*) In late 2013, however, Mr. Bortz reviewed Ms. Goroff's website as he considered hiring her Massachusetts-based firm,

---

[1] The court takes as true the allegations in Bancroft's complaint for purposes of resolving the defendants' motion to dismiss. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

1

Sandra Goroff and Associates ("the Firm"), to publicize a new Bancroft book. (*Id.* ¶ 5.) That book, a novel by David Andrews called My Father's Day Gift, was set to be published in March 2014. (*Id.* ¶¶ 5, 64, 69.) Bancroft alleges Ms. Goroff's website stated that her clients "include" a number of prominent authors, though none of those authors were then her clients. (*Id.* ¶ 10.) Further, some of these authors were never the Firm's clients, though Ms. Goroff did some work for them as a publicist for a previous employer.[2] (*Id.*) Bancroft also alleges that by this time, Ms. Goroff's professional contacts "had dried up" as she took on fewer book publicity jobs, (*id.* ¶ 24), and spent less of her professional activity on book publicity activities, (*id.* ¶¶ 33-35).

On November 17, 2013, Mr. Bortz called Ms. Goroff to discuss the possibility that her Firm would publicize My Father's Day Gift. (*Id.* ¶¶ 5, 36.) In that conversation, Ms. Goroff stated that (1) publicity activities related to her own photograph book, Solitary Soul, would not distract her; (2) she and Mr. Peretsky would work together, as they had on "many" previous book publicity projects, to publicize My Father's Day Gift; and (3) the involvement of Mr. Andrews's father in the book was "a real winner from a publicity standpoint . . . ." (*Id.* ¶ 36.) Bancroft asserts that these three representations were false. (*Id.* ¶ 37.)

After this conversation, Bancroft and the Firm entered into an agreement ("the First Agreement") under which Bancroft would pay $9,000 for the Firm's "best efforts to secure appropriate print, broadcast, online and social media to promote" My Father's Day Gift from December 2, 2013, through Father's Day, June 15, 2014. (*Id.* ¶ 45; Compl. Ex. 6.) Ms. Goroff executed the First Agreement on November 22, 2013, and Mr. Bortz executed it on December 2, 2013. (*Id.*) Though the Firm charged several thousand dollars more than Bancroft typically paid

---

[2] Bancroft also alleges that Ms. Goroff was quoted in a July 2013 article stating that her clients "range" from particular individuals and entities to others, when those individuals and entities were not then her clients. (*Id.* ¶ 11.) Bancroft does not allege when Mr. Bortz read this article.

for publicity services, Mr. Bortz believed he was paying for "above average clout with the national media." (*Id.* ¶ 48.)

Bancroft was not happy with the results. Bancroft sent the defendants marketing materials that it says they did not use. (*Id.* ¶¶ 50-51; Compl. Ex. 7.) The defendants did not call Bancroft to report on their progress, and most of their emails to Bancroft concerned payment of their fees rather than publicity. (*Id.* ¶¶ 52-53.) On Mr. Bortz's request, however, Bancroft provided a list of media outlets the Firm had contacted. (*Id.* ¶ 54; Compl. Ex. 9.) The only publicity the Firm garnered was an appearance by Mr. Andrews on a Boston radio show that the defendants "misrepresented as having the equivalence of national reach . . . ." (*Id.* ¶ 57). Bancroft secured a commitment from USAToday.com to run an op-ed piece, but the defendants "apparently antagonized the editor to such a degree that he dropped the commitment." (*Id.* ¶ 58.) Bancroft says it "held back attempting to get any publicity for the book in hopes that" the defendants would succeed in doing so, and that Mr. Andrews "refrained" from using publicity services "easily available to him" out of "deference" to the defendants. (*Id.* ¶ 63.)

Nevertheless, Bancroft "reluctantly decided" to enter into another book publicity contract with the Firm, this time for a "political thriller called Aftershock" set to be published in July 2014. (*Id.* ¶ 65.) Under this agreement ("the Second Agreement"), Bancroft would pay $7,500 for the Firm's "best efforts to secure appropriate print, broadcast, online and social media to promote" Aftershock and its author from March 5, 2014, to July 5, 2014. (*Id.* ¶ 66; Compl. Ex. 15.) Though the Second Agreement identified the book's author as JL Herschenroeder, the author's name was actually Joe Lane.[3] (*Id.* ¶ 65.) In any event, the Firm agreed to "work cooperatively" with Bancroft and the author and to "provide regular updates." (*Id.* ¶ 67; Compl.

---
[3] The defendants explain that their inclusion of the wrong name for the author arose from their misreading of a description of Aftershock on Bancroft's website. (Mot. Dismiss 9, ECF No. 3)

Ex. 15.) Bancroft alleges that the defendants "failed to file regular and detailed reports" and failed to use a detailed marketing plan Bancroft had prepared. (*Id.* ¶ 68; Compl. Ex. 17.) As a result, Bancroft says that the defendants obtained "merely two pieces of minor publicity": a piece in a "local giveaway newspaper in Connecticut, the author's home state," and a "much-delayed radio gig on the same show" they had arranged for Mr. Andrews. (*Id.* ¶ 69.) In addition, Bancroft asserts that Ms. Goroff publicized her own photography book, including through the use of social media, in 2013 and "well into the summer of 2014." (*Id.* ¶¶ 18-23.)

On September 2, 2014, Bancroft filed a complaint in this court alleging that the defendants breached the two agreements, and committed fraud by misrepresenting "their recent history, both orally and on their website." (*Id.* ¶¶ 70-71.) Bancroft's claimed damages include $14,900 it paid under the two agreements,[4] consequential damages over of $100,000 in lost sales for books it says went unsold because of alleged publicity failures, and punitive damages. On September 24, 2014, the defendants, acting pro se, filed a motion to dismiss. On November 23, 2014, Bancroft filed a belated, three-sentence opposition, to which the defendants replied. On December 30, 2014, Bancroft filed a motion to compel answers to interrogatories.

## ANALYSIS

**Motion to Dismiss Standard**

When ruling on a motion under Federal Rule of Civil Procedure 12(b)(6), the court must "accept the well-pled allegations of the complaint as true," and "construe the facts and reasonable inferences derived therefrom in the light most favorable to the plaintiff." *Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997). "Even though the requirements for pleading a

---

[4] Bancroft paid only $5,900 of the $7,500 it was contractually obligated to pay under the Second Agreement because the defendants "reluctantly agreed to forego the final payment" of $1,600. (Compl. ¶ 75.)

4

proper complaint are substantially aimed at assuring that the defendant be given adequate notice of the nature of a claim being made against him, they also provide criteria for defining issues for trial and for early disposition of inappropriate complaints." *Francis v. Giacomelli*, 588 F.3d 186, 192 (4th Cir. 2009). "The mere recital of elements of a cause of action, supported only by conclusory statements, is not sufficient to survive a motion made pursuant to Rule 12(b)(6)." *Walters v. McMahen*, 684 F.3d 435, 439 (4th Cir. 2012) (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). To survive a motion to dismiss, the factual allegations of a complaint "must be enough to raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations omitted). "To satisfy this standard, a plaintiff need not 'forecast' evidence sufficient to prove the elements of the claim. However, the complaint must allege sufficient facts to establish those elements." *Walters*, 684 F.3d at 439 (citation omitted). "Thus, while a plaintiff does not need to demonstrate in a complaint that the right to relief is 'probable,' the complaint must advance the plaintiff's claim 'across the line from conceivable to plausible.'" *Id.* (quoting *Twombly*, 550 U.S. at 570).

In considering a Rule 12(b)(6) motion, the court need not always limit its review to the pleadings. It can also take judicial notice of public records, including statutes, and can "consider documents incorporated into the complaint by reference, as well as those attached to the motion to dismiss, so long as they are integral to the complaint and authentic." *United States ex rel. Oberg v. Pennsylvania Higher Educ. Assistance Agency*, 745 F.3d 131, 136 (4th Cir. 2014) (citations and internal quotation marks omitted).

**Fraud Claim**

Bancroft's fraud count asserts that the defendants "misrepresented their recent history, both orally and on their website," and that Bancroft "relied on those misrepresentations, to its great detriment." (Compl. ¶ 71.) To determine whether Bancroft has stated a fraud claim for which relief can be granted, the court must first determine what law applies. "In a diversity case, a district court applies the conflict-of-law rules of the state where it sits." *DiFederico v. Marriott Int'l, Inc.*, 714 F.3d 796, 807 (4th Cir. 2013). In determining what body of law to apply in a tort case, Maryland follows the rule of *lex loci delicti*, under which a court applies the law of the state where the last event constituting the tort occurred. *Id.*; *see also Lab. Corp. of Am. v. Hood*, 911 A.2d 841, 845 (Md. 2006). "[U]nder Maryland conflict of law jurisprudence, 'the law of the place of injury applies. The place of injury is the place where the injury was suffered, not where the wrongful act took place.'" *Philip Morris Inc. v. Angeletti*, 752 A.2d 200, 231 (Md. 2000) (citation omitted).

"Maryland courts have not addressed the issue of where the 'wrong' occurs in cases of fraud, or negligent misrepresentation, when the alleged wrongful act and the alleged loss occur in separate jurisdictions." *Hardwire LLC v. Goodyear Tire & Rubber Co.*, 360 F. Supp. 2d 728, 734 (D. Md. 2005). *See also Philip Morris Inc.*, 752 A.2d at 233 n. 28 ("[N]either this court nor the Court of Special Appeals has had occasion to discuss the impact of *lex loci delicti* on some . . . tort causes of action."). In *Cremi v. Brown*, 955 F. Supp. 499, 523 (D. Md. 1997), however, this court determined that "the highest court of Maryland would adhere to *lex loci delecti* in multi-state misrepresentation cases" if confronted with the issue.[5] Recent Maryland case law

---

[5] In *Hardwire*, this court certified the following question to the Court of Appeals of Maryland: "What jurisdiction's substantive law governs in the case of fraud where the wrongful act and the plaintiff's injury occur in two different

does not appear to have shed any light on the issue. In any event, the court agrees that the Court of Appeals of Maryland would adhere to *lex loci delicti* in multi-state misrepresentation cases. Because Bancroft's alleged injuries occurred in Maryland, the court will apply Maryland law to Bancroft's fraud claim.

Under Maryland law, a plaintiff seeking to demonstrate civil fraud based on an affirmative misrepresentation must show that

> (1) the defendant made a false representation to the plaintiff, (2) the falsity of the representation was either known to the defendant or the representation was made with reckless indifference to its truth, (3) the misrepresentation was made for the purpose of defrauding the plaintiff, (4) the plaintiff relied on the misrepresentation and had the right to rely on it, and (5) the plaintiff suffered compensable injury as a result of the misrepresentation.

*Hoffman v. Stamper*, 867 A.2d 276, 292 (Md. 2005).[6]

In addition, Federal Rule of Civil Procedure 9(b) "requires a plaintiff to plead 'with particularity the circumstances constituting fraud.'" *Spaulding v. Wells Fargo Bank, N.A.*, 714 F.3d 769, 781 (4th Cir. 2013) (quoting Fed. R. Civ. P. 9(b)). These "circumstances include the time, place, and contents of the false representations, as well as the identity of the person making the misrepresentation and what he obtained thereby." *Id.* (citation and internal quotation marks omitted). *See also* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."). The purposes of Rule 9(b) are to provide notice to a defendant of its alleged misconduct, prevent frivolous suits, eliminate fraud actions in which all

---

jurisdictions?" 360 F. Supp. 2d at 735. That case settled a few months later, however, and the court withdrew its certification order as moot. *See Hardwire LLC v. Goodyear Tire & Rubber Co.*, 04-2524-RDB, ECF No. 45 (D. Md. Sept. 12, 2005).

[6] Bancroft styled its complaint as one for both "fraudulent misrepresentation" and "fraud in the inducement." "[F]raudulent inducement 'means that one has been led by another's guile, surreptitiousness or other form of deceit to enter into an agreement to his detriment.'" *Rozen v. Greenberg*, 886 A.2d 924, 929 (Md. Ct. Spec. App. 2005) (citation omitted). "'Fraud encompasses . . . fraudulent inducement.'" *Sass v. Andrew*, 832 A.2d 247, 261 (Md. Ct. Spec. App. 2003) (citation omitted). Accordingly, a plaintiff asserting a claim for fraudulent inducement must still demonstrate "[t]he elements of civil fraud based on affirmative misrepresentation . . . ." *Rozen*, 886 A.2d at 930.

the facts are learned after discovery, and protect defendants from harm to their goodwill and reputation.  *U.S. ex rel. Nathan v. Takeda Pharm. N. Am., Inc.*, 707 F.3d 451, 456 (4th Cir. 2013).  "A court should hesitate to dismiss a complaint under Rule 9(b) if the court is satisfied (1) that the defendant has been made aware of the particular circumstances for which she will have to prepare a defense at trial, and (2) that [the] plaintiff has substantial prediscovery evidence of those facts."  *Harrison v. Westinghouse Savannah River Co.*, 176 F.3d 776, 784 (4th Cir. 1999).

Turning to Bancroft's claim, Bancroft does not allege that Mr. Peretsky made any misrepresentations on which it relied.  Accordingly, Bancroft's fraud claim will be dismissed as to Mr. Peretsky.  As to Ms. Goroff, Bancroft alleges the following misrepresentations: (1) Ms. Goroff's website stated that her clients "include" authors who were not then her clients, (Compl. ¶ 8); (2) A July 2013 article quoted Ms. Goroff as stating that her clients "range" from particular individuals and entities to others, when those individuals and entities were not then her clients, (*id.* ¶ 11); (3) in a phone conversation with Mr. Bortz on November 17, 2013, Ms. Goroff stated that she would not be distracted by publicity concerning her photography book; (4) in that same conversation Ms. Goroff stated that she and Mr. Peretsky had worked together on "many" book publicity projects over the previous four years, (*id.* ¶ 36), though they had done so for only two books during that time, (*id.* ¶ 37); and (5) also in that conversation Ms. Goroff stated that the role of Mr. Andrews's father in the book was "a real winner from a publicity standpoint," (*id.*).  For a number of reasons, none of these alleged misrepresentations support Bancroft's fraud claim.

First, Bancroft does not make even a conclusory allegation that Ms. Goroff made any of these representations "for the purpose of defrauding" Bancroft.  *Hoffman*, 867 A.2d at 292.

Second, Ms. Goroff did not make the representations in her website or in the July 2013 article "to the plaintiff." *Id.* Third, Bancroft makes no allegation as to whether Mr. Bortz read the July 2013 article before entering into one or both of the publicity contracts, or whether Mr. Bortz relied on Ms. Goroff's statements in the article. Fourth, the screenshot of Ms. Goroff's website that Bancroft attached to its complaint contradicts Bancroft's allegations, because the website does not use the word "include." Rather, the website simply provides a list of names under the word "clients." (Compl. Ex. 1.) *Cf. Hosack v. Utopian Wireless Corp.*, No. DKC 11-0420, 2011 WL 1743297, at *5 (D. Md. May 6, 2011) ("[W]hen a complaint contains inconsistent and self-contradictory statements, it fails to state a claim.").[7] Fifth, Ms. Goroff's statement that she would not be distracted by publicity activities for her own book cannot support a fraud claim because Bancroft does not allege (nor could it) that Ms. Goroff's publicity activities for her book "distracted" her from publicizing Bancroft's books. Bancroft's allegations that Ms. Goroff used social media platforms, (Compl. ¶ 19), to publicize her book "well into the summer of 2014," (Compl. ¶ 23), are irrelevant, because Bancroft does not allege that Ms. Goroff promised to devote all her time to publicizing Bancroft's books. Sixth, Ms. Goroff's statement that she and Mr. Peretsky had worked on "many" book publicity projects together cannot support a fraud claim. Maryland law is clear that to support an action for fraud, "mere vague, general, or indefinite statements are insufficient, because they should, as a general rule, put the hearer upon inquiry, and there is no right to rely upon such statements." *Fowler v. Benton*, 185 A.2d 344, 349 (Md. 1962). Thus, statements amounting to mere "puffing" by a seller of goods or services cannot support a fraud claim. *See First Union Nat. Bank v. Steele Software Sys. Corp.*, 838 A.2d 404, 442-44 (Md. Ct. Spec. App. 2003). Bancroft had no right to rely on Ms. Goroff's statement

---

[7] Unpublished cases are cited for the persuasiveness of their reasoning, not for any precedential value.

that she had worked on "many" book publicity projects with Mr. Peretsky because in this context, "many" is vague, general, or indefinite. *See also Milkton v. French*, 150 A. 28, 32 (Md. 1930) (statements that "are but the indefinite generalities of exaggeration" do not amount to a misrepresentation). Seventh, Ms. Goroff's statement that the involvement of Mr. Andrews's father in his book was "a real winner from a publicity standpoint" is an opinion, and an opinion cannot constitute a "false representation." *Parker v. Columbia Bank*, 604 A.2d 521, 528 (Md. Ct. Spec. App. 1992).

Bancroft has thus failed to state a fraud claim, and that claim will be dismissed.

**Contract Claim**

Bancroft alleges that the defendants breached both the First and Second Agreements. "When determining which law controls the enforceability and effect of a contract, [Maryland courts] generally appl[y] the principle of *lex loci contractus*. Under this principle, the law of the jurisdiction where the contract was made controls its validity and construction." *Kramer v. Bally's Park Place, Inc.*, 535 A.2d 466, 467 (Md. 1988). "For choice-of-law purposes, a contract is made where the last act necessary to make the contract binding occurs." *Konover Prop. Trust, Inc. v. WHE Assocs., Inc.*, 790 A.2d 720, 728 (Md. Ct. Spec. App. 2002). "Generally, that last act is a party's signature." *Baker v. Antwerpen Motorcars Ltd.*, 807 F. Supp. 2d 386, 389 n.13 (D. Md. 2011).

Bancroft does not allege the location of either party when either contract was executed. It is a logical inference from the complaint, however, that Ms. Goroff was in Massachusetts (where she lives and works) and Mr. Bortz was in Maryland (where Bancroft is based). Mr. Bortz executed both contracts after Ms. Goroff did so. (*See* Compl. Exs. 6, 15.) Accordingly, the last

acts necessary to make the contracts binding occurred in Maryland, and Maryland law applies.

The defendants first argue that because Mr. Peretsky was not a party to either contract, he cannot be held liable for any alleged breach. The defendants are correct. "Maryland law requires that a plaintiff alleging a breach of contract 'must of necessity allege with certainty and definiteness *facts* showing a contractual obligation owed by the defendant to the plaintiff and a breach of that obligation by defendant.'" *Polek v. J.P. Morgan Chase Bank, N.A.*, 36 A.3d 399, 416 (Md. 2012) (citation omitted). Bancroft has failed to allege facts showing that Mr. Peretsky owed it any obligation. Accordingly, the contract claim against Mr. Peretsky will be dismissed.

Next, as to the First Agreement, which obligated the Firm to "use its best efforts" to garner publicity for My Father's Day Gift, the defendants argue that Bancroft's allegations concern outcomes, not efforts, and that the Firm did put forth its best efforts[8] in publicizing both My Father's Day Gift and Aftershock. Bancroft's allegations concerning the defendants' performance under the First Agreement amount to the following: (1) the defendants did not make substantive comments to Mr. Bortz regarding Bancroft's marketing plan for My Father's Day Gift, (Compl. ¶ 50); (2) "[t]here is no evidence" that the defendants "followed up on any item" in the marketing plan, (*id.* ¶ 51); (3) "with very few exceptions," most emails the defendants sent Bancroft concerned payment of fees under the contract, (*id.* ¶ 52); (4) the defendants "initiated no phone calls" to Bancroft to report on the progress of their efforts, (*id.* ¶ 53); (5) the defendants sent Bancroft "a simple list of who in the media they had contacted" only after Bancroft requested "a detailed progress report," (*id.* ¶ 54; Compl. Ex. 9); (6) the only piece of publicity

---

[8] "[C]ontractual 'best efforts' terms are enforceable under Maryland law, even when parties to a contract have chosen not to define those terms or expressly provide a standard by which to measure a promisor's performance . . . ." *Baron Fin. Corp. v. Natanzon*, 509 F. Supp. 2d 501, 513 (D. Md. 2007). *See also 8621 Ltd. P'ship v. LDG, Inc.*, 900 A.2d 259, 267 (Md. Ct. Spec. App. 2006) ("There are many types of enforceable commercial contracts that deliberately select an 'open' term of performance such as those that require the parties to use 'best efforts,' 'good faith,' or 'reasonable efforts.'"); *First Union Nat. Bank*, 838 A.2d at 448 (a "best efforts" contract term "has diligence as its essence").

that the defendants secured was an appearance on a Boston radio show that they misrepresented as having the equivalence of national reach, (*id.* ¶ 57); (7) the defendants "apparently antagonized" a newspaper editor to such a degree that he dropped a commitment to publish an op-ed piece related to the book, (*id.* ¶ 58); (8) the defendants "failed to test/hone their pitch to something that worked," (*id.* ¶ 59); (9) the defendants did not "adjust, downward, their target media list," (*id.* ¶ 61); and (10) the defendants did not inform Bancroft of whether people "they had pitched" responded to the pitch, (*id.* ¶ 62).

These allegations fail to state a claim for breach of the First Agreement because they do not concern the defendants' "efforts." Rather, they concern either a failure to communicate where no contractual duty to communicate existed, a failure to garner a degree of publicity satisfactory to Bancroft where the contract speaks not of results but of efforts, or a failure to adopt strategies Bancroft viewed as desirable where the contract did not require them to do so. For example, Bancroft's allegation that the defendants "failed to test/hone their pitch to something that worked," (*id.* ¶ 59), is a results-based allegation couched in the language of efforts; this allegation simply asserts that none of the defendants' pitches worked. A promise to use "best efforts" is not a guarantee that a particular result will be achieved. Nor does a "best efforts" clause necessarily obligate the promisor "to give all of its efforts toward assisting or promoting the promisee's interests or product . . . ." *First Union Nat. Bank*, 838 A.2d at 429. A "best efforts" clause is just that, a promise to use best efforts, and Bancroft's allegations do not concern the defendants' efforts. Accordingly, those allegations fail to state a claim for breach of the First Agreement, and Bancroft's claimed breach of that agreement will be dismissed.

To the extent Bancroft claims that the defendants breached the Second Agreement's "best

efforts" clause, that claim fails for the same reasons as its claimed breach of the First Agreement's "best efforts" clause fails: Bancroft's allegations do not concern the defendants' publicity efforts.

The only remaining claim, therefore, is one for Ms. Goroff's alleged breach of the Second Agreement. Unlike the First Agreement, the Second Agreement required the Firm to "work cooperatively with Bancroft Press and [the author] and provide regular updates." (Compl. Ex. 15.) Bancroft alleges that the defendants failed to use the marketing plan it sent them, and failed to "file regular and detailed reports . . . ." (Compl. ¶ 68.) The defendants raise several arguments against this allegation in their motion to dismiss, and attach a number of their communications with Bancroft. (*See, e.g.*, Mot. Dismiss Ex. 12.) Bancroft filed its response in opposition to the motion to dismiss more than a month late, despite having requested no extension. Further, its "response" was a mere three sentences long, was entirely conclusory, and contained no specific arguments addressing the defendants' points. Accordingly, the court will dismiss Bancroft's remaining claim against Ms. Goroff on this basis. *See Ferdinand-Davenport v. Children's Guild*, 742 F. Supp. 2d 772, 783 (D. Md. 2010) (a plaintiff's failure to address arguments in a defendant's motion to dismiss a particular claim constitutes an abandonment of the claim).

## CONCLUSION

For the reasons stated above, the motion to dismiss will be granted in its entirety. The motion to compel will be denied as moot. A separate order follows.


December 31, 2014                                   /S/
Date                                               Catherine C. Blake
                                                   United States District Judge